Mr. Justice Shepard
delivered the opinion of the Court:
This is an appeal from the decision of the Commissioner *334 of Patents in an interference proceeding, the issue of which was declared in the following terms:
“ 1. The combination, in an apparatus for making flexible films of nitrocellulose, of a relatively movable plate of rolled aluminum and a suitable device for spreading fluid nitrocellulose on the plate, whereby uniformity in the thickness of the films throughout their length is secured.
“ 2. The combination in an apparatus for making flexible films of nitrocellulose of a traveling plate of rolled aluminum, and a suitable device for spreading the fluid nitrocellulose on the plate during its movement.
“ 3. The combination in an apparatus for making flexible films of nitrocellulose of a traveling plate of rolled aluminum, a suitable stationary device for spreading the fluid nitrocellulose on the plate, and a heated drying-chamber into which'the coated plate is delivered.”
Henry M. Reichenbach, who is a chemist and an expert in the particular art, alleges conception of the invention in April, 1892, disclosure and experiments in May, and drawings in September of the same year. He also claims to have begun the construction of a model machine in October, 1896, which he had not completed. He filed an application for patent April 1, 1897, and received the same February 22, 1898.
Frederick H. Kelley, who was an expert mechanic engaged in making photographic devices, claims invention and disclosure to others in June, 1894; the making of drawings and of an operative machine in December of the same year. His application for patent, on which this interference was declared with Reichenbach’s patent, was not filed until April 11, 1898.
The examiner of interferences was of the opinion, that whilst Reichenbach had evidently discovered at an early date that aluminum was a suitable metal upon which to make the desired film, his proof was insufficient to show *335 conception of the apparatus defined in the issue before the date of his application for patent. He was also of the opinion that Kelley had made a machine, as claimed, in December, 1894, and reduced to practice the first two counts of the issue. On account, however, of the inexcusable delay of Kelley until after the issue and publication of Reich enbach’s patent, he awarded priority to the latter.
Kelley appealed to the examiners in chief, who affirmed the decision of the examiner, without concurring in all of his conclusions. They agreed with him that Reichenbach’s proof was insufficient to carry his date of conception back of his appearance in the office, and that Kelley had conceived the invention in 1894, and built a machine in December of that year, upon which he had produced a piece of film in.January, 1895, but disagreed with his conclusion that the operation of the machine was a satisfactory reduction to practice.
The Commissioner, on appeal to him, agreed with both previous decisions in respect to Reichenbach’s date of conception, and with the examiner of interferences in respect of Kelley’s conception and actual reduction to practice in January, 1895. He therefore awarded priority to Kelley, but at the same time declared that his inexcusable delay barred his right to a patent, and directed the rejection of his application should the final decision be in his favor.
1. The first ground of the reasons of appeal is “that the Commissioner erred in holding that Reichenbach has failed to show that he had the invention in controversy at an earlier date than that of his application for patent.”
In this conclusion, as we have seen, all of the tribunals of the Patent Office concurred. The evidence on behalf of Reichenbach has been fully and fairly discussed in the successive decisions of those tribunals, and its review by us is unnecessary. Our conclusion is 'that there was no error in that part of the decision appealed from. Conception of *336 invention has a well established signification in the patent law. Mergenthaler v. Scudder, 11 App. D. C. 264, 276; Hunter v. Stikeman, 13 App. D. C. 214, 218.
Tested thereby, we are of the opinion that Reichenbach’s testimony, while showing that he had discovered the suitability of aluminum as a metal upon which to make the desired film, falls short of proving that he had the required conception of the invention of this controversy before he prepared his application for the patent which issued thereon.
2. Reichenbach having obtained a patent for the invention before Kelley entered the office, the burden is upon the latter to show, beyond a reasonable doubt, prior conception and reduction to practice.
In view of the fact that Reichenbach’s date of conception has been limited to the date of his application for the patent, namely April 1, 1897, it becomes unnecessary to determine upon what date Kelley arrived at his conception.
He claims to have constructed a machine in the latter part of 1894, embodying his conception of the invention of the issue, and to have operated it successfully in the early part of 3895. And the evidence shows beyond a reasonable doubt that he did construct a machine in an effort to carry out his idea of making the celluloid base for flexible photographic films, upon an aluminum surface, about the time claimed therefor. The question, therefore, upon which the controversy turns, is, whether that machine, in its construction and - operation, amounted to a successful reduction to practice, or to nothing more than an unsatisfactory experiment by reason of which it was abandoned.
On this question, as heretofore stated, the Patent Office tribunals were divided in opinion.
3. Preliminary to the consideration of the evidence, and as an aid to a satisfactory understanding of it in all of its bearings, it is worth while to consider the state of the art to which this invention pertains, and to briefly state some of the circumstances surrounding the operations of the parties.
*337 Before the alleged conception of either party to this controversy, flexible films of celluloid base had been manufactured and widely used in roll-holding cameras. The mixture of nitrocellulose, called “dope” by those engaged in its manufacture, was forced, in a semifluid state, from a tank or hopper upon plates of metal or glass, where it was spread the desired length and width and dried for use. The sensitive emulsion necessary for taking the picture was then thinly coated thereon. The demands of the trade called for this film in large quantities and in rolls of great length. In using plates of the cheaper metals, namely iron, brass and copper, it was found that small particles of the metal would adhere to the base which, through chemical changes caused by contact with the sensitive emulsion, would tend to spoil the film in places. Plates of glass were used with greater success, but two difficulties were encountered with them. First, the film was frequently spoiled by electric discharges which took place when it was stripped from the plate. Second, the inability to join the plates of glass together in such manner as to prevent inj ury to the films at the joints. The growing demand for very long films greatly increased the seriousness of this difficulty. It therefore became important to find a metal that would not give off injurious particles like iron, brass and copper, and yet would be of reasonable cost and susceptible of being rolled into thin plates or bands of great length. Reichenbach discovered the advantages of aluminum in these respects as early as 1892, but, as we have seen, failed to reduce his discovery to practice in so far as the invention in controversy is concerned.
4. The evidence on behalf of Kelley shows that he did not apply to the- base produced on an aluminum plate, the photographic emulsion necessary to its usefulnesss in the camera; and though he says in his testimony, that he knew aluminum would not contaminate the emulsion, it nowhere appears how he acquired that knowledge.
*338 The evidence shows that one Blair, in whose employ Kelley was in 1894, was in England trying to organize a camera manufacturing company there. In a letter to Kelley he-suggested a machine on the order of that afterwards made for him by Kelley, and inclosed him a blue-print of his design. This represented a machine having two pulleys separated a certain distance on a horizontal plane. Around these pulleys was to run a metal band connected so as to make it an endless belt. Rollers supported the upper stretch of 'this band at suitable intervals. Directly over the center of one of the pulleys was placed a hopper which was to receive the “dope” and distribute it on the belt as it passed under the hopper. This endless belt was directed to be made of brass. In order to make the machine operate satisfactorily it was necessary to make a thoroughly good joint in the belt, else the film formed thereon would be defective. Kelley says that he found it impossible to make the required joint in brass. As stated by him: “ Heating the metal hot enough to melt the solder annealed the metal and released the strains which had been set up when the metal was rolled out, causing it to buckle to such an extent that we could not use it.”
For this reason only he decided to abandon brass, and he substituted aluminum because he felt confident, from tests made, that he could make a satisfactory joint with it. He then proceeded to construct the machine for Blair, and made the belt of three rolled strips of aluminum twenty feet long and twenty inches wide. The ends of these strips he says were joined “in a satisfactory manner,” though he declined to describe the process. The machine stood for some time in the shops of the European Blair Camera Company, in Boston, at No. 485 Tremont street, and its parts moved in a satisfactory manner upon a trial made. It was removed to 46 Wareham street in January, 1895, and there set up, but not used.
Kelley testified, that in the spring of 1895, he tested the *339 machine in making film-base. C. E. Doyle assisted him. Having placed some “ dope ” in the tank, the plunger to force it out was put in position. Doyle operated the machine by hand. About fifteen feet of base were run off. One witness, F. E. Cobb, corroborated Kelley in respect of the construction of the machine. He was a mechanic and did most of the work for Kelley. One witness, C. E. Doyle, testified to making the celluloid base above mentioned. It is not claimed that any more was ever made upon the machine. The piece made was not coated with the emulsion, and no part of it could be produced.
Kelley testified that the base so made was good, and he was thoroughly satisfied with it. On May 1, 1895, he shipped the machine to London for delivery to Blair.
We can'have no reasonable doubt that a machine for the purpose of making film-base was constructed as claimed; but we are not satisfied that it amounted to anything more than an abandoned experiment, for the following reasons:
(1) The original conception of the machine was that of Blair, who directed the endless belt to be made of brass. Kelley testified that after repeated experiments he abandoned the brass belt because he could not join the ends in a satisfactory manner. .Having said that he had succeeded in making the desired joints in the aluminum belt, he was cross-examined thereon. Having stated that these were neither butt nor lap joints he declined to answer further questions; his counsel having objected that the process of making the joints was not material, and its description would be a disclosure of an invention not included in this controversy. Upon like advice, his witness Cobb, who did most of the work upon the machine, also declined to answer questions concerning the joints made in the aluminum strips.
Kelley having admitted that the efficiency of his machine depended upon the making of perfect joints in the belt, and that he had abandoned the cheaper brass belt, recommended by Blair, because of the impracticability of joining *340 its ends in a satisfactory manner, wé can not agree that the character of the joints made in the substituted aluminum was either immaterial or irrelevant. Upon the efficiency of these joints, according to him, depended the successful reduction to practice of the invention. That it may have been the subject of independent and patentable invention can not justify his refusal to disclose it. If an invention, it was clearly known to Kelley, at the time, to be a valuable one; and yet he made no application for a patent to protect it. It was even then easy to protect himself from the consequences of a forced disclosure by making an immediate application. Under the circumstances, his refusal to testify naturally casts doubt upon his claim that the new belt rendered the machine operative to his satisfaction at the time he made the piece of film-base thereon. This piece, it will be remembered, was only about fifteen feet long, and its manufacture does not appear to have extended over one of these joints. No other trial was ever had. The piece made was not treated with emulsion and tested. No part of it has been preserved.
(2) The fact that the machine was taken apart, boxed and shipped at great expense to London has been urged as convincing evidence of Kelley’s complete satisfaction with its performance for all uses intended. The force of this argument is seriously impaired, if not entirely broken, by the circumstances surrounding the construction and shipment, and by the failure to account for it thereafter. Blair was the projector of the machine. He was the principal; Kelley was his agent. Kelley does not testify as to the first communication to him by Blair of his conception. The first letter of Blair, which he produced, shows that he had received previous information of Blair’s general design. It also appears from this letter (dated London, April 4,1894), that Blair then contemplated making his machine in England. He asks Kelley to see if he can procure in Boston, what he could not find in London, namely, a strip of brass *341 one hundred and fifty feet long, twenty-one to twenty-four inches wide and one thirty-second of an inch thick. He directs him to cable the fact and the price. He adds: “ This is to be used instead of the cylinder and I wish the fact kept quiet' until my return.”
Another letter, of May 11, 1894, says; “I have the band for making the base protected in America as well, and there is no patent on the film, so that should we undertake to do this it would be best for you to come over here and studiously look this place over and then go in for the whole thing together, but we must leave this until in shape for apparatus. . . . We will be experimenting on making the base here. . . .” (As there is no evidence concerning the protection of the band by patent in England, it is probable that the word “ will,” was intended to precede “have,” in the beginning of the sentence quoted.)
In the next letter shown (May 17, 1894), he says: “I have decided to let you start in on making the film base-making machine and band in America. I inclose you a blue-print and specifications. This is as far as I have gone. You will understand the use as well as I.” He then enters into a brief explanation of certain suggestions, and concludes thus: “Regarding a spreading hopper, leave this until the last. I will get further information. You can try surface by flowing.”
Other letters of Blair to Kelley show his anxiety to get a machine for exhibition to his associates in England, where he was engaged, apparently, in an attempt to organize a corporation for the exploitation of his schemes. For some reason or other, probably because of his confidence in his contemplated machine, his letters show no anxiety for a thorough test of it by Kelley. In a letter of September 21, 1894, he says: “I would not order much of the dope until I return.”
For some reason or other he did not then return. Kelley referred to this letter, and to the expensive nature of *342 “dope,” to account in part for his failure to make further tests. The machine was made at Blair’s expense and for him. Kelley was his employee, carried out his instruc-. tions, and was at no expense and under no responsibility. He undertook to account, in part, for his failure to apply for a patent, on the ground that he considered certain parts of the machine Blair’s invention and not his own. He further said that Blair came to America in 1895, and gave verbal orders for shipping the machine to England. When he came, how long he stayed, and what he did beyond this, nowhere appears. He was the projector of the original machine, and was regarded by Kelley as the inventor. The cost of construction had been incurred; there was comparatively little expense to be added for carriage; and he may well have expected to be able to have the machine improved or reconstructed under his own supervision in England. Now, whilst Blair, aside from all this, has been shown to have an interest in this issue, through some connection with the American Camera Company, the assignee of Kelley, he has not been called as a witness, nor has the omission been explained in a satisfactory manner.
Of still greater weight in its bearing upon the point in controversy is the failure of evidence following this machine to London, where it was evidently intended to be operated in the manufacture of film-base, if practicable, or to be improved and perfected if not capable of the désired use. Had it been there tested and found to be what Kelley now declares it was, it seems improbable that evidence thereof would not have been forthcoming.
(3.) The long delay of Kelley to apply for a patent is the last circumstance raising doubt in respect of his completion of invention.
That he has not accounted for, or plausibly explained, this delay, has been held b} all of the tribunals of the Patent Office. The grounds of their several conclusions, in which *343 we entirely concur, are so fully and fairly set forth in their decisions, that to restate them would be a work of supererogation. It may be added, however, that the complete refutation of Kelley’s attempt to excuse himself on account of his relations with Blair, tends to discredit his own testimony upon all points.
The examiner of interferences, who, as we have seen, accepted as conclusive Kelley’s evidence of reduction to practice, nevertheless held him barred by this delay from asserting his claim against Reichenbach, who, in the meantime, had made the invention and secured a patent for it, on the authority of In re Mower, 15 App. D. C. 144. The Commissioner, who was of the opinion that the testimony of Kelley brought his reduction to practice within certain decisions, namely, Coffee v. Guerrant, 3 App. D. C. 497, Wurts v. Harrington, 10 App. D. C. 149, and others cited, and thereon denied priority to Reichenbach, at the same time declared that Kelley had lost his right to a patent for the invention by reason of his unexplained delay. His conclusion was that the case, on that point, fell within a doctrine enounced in the following cases: In re Mower, 15 App. D. C. 144; Mason v. Hepburn, 13 App. D. C. 86, 93; Davis v. Forsyth, 87 O. G. 516. See, also, Warner v. Smith, 13 App. D. C. 111, 114.
The examiners in chief regarded this delay, not in the light of a bar to Kelley, or as an estoppel on behalf of Reichenbach, but as a circumstance casting a reasonable doubt upon Kelley’s claim of reduction to practice. In their view, the facts brought the case within the principle stated in Mason v. Hepburn, 13 App. D. C. 89, as follows:
“The fact that the construction of the device had not been followed within a reasonable time by practical or commercial use or application for patent, would afford a strong inference that what had been done was regarded by the inventor as experimental only and not completion of *344 invention, and this would be materially reinforced if in the meantime the machine had been dismantled or destroyed.”
The machine in this case is not shown to have been dismantled or destroyed; but it completely disappeared, so far as the record shows, from the date of its shipment to England.
After careful consideration of the facts of this case, and the law in application thereto, our conclusion is: That the single test of the machine, confessedly made by Kelley, the shipment to England and omission of evidence respecting its use or operation there, the failure of any of the parties concerned to make another machine to supply the growing demand in this country for long pieces of the film and the failure to apply for a patent until after the publication of that issued to Reichenbach, tend to show, not the willful secretion or abandonment of a complete invention, but rather the failure of an attempt to reduce the conception of a valuable invention to practice, and the abandonment of further experiments in that direction.
Without consuming time with a review of the decisions relied on in support of the claim of Kelley to priority, we think it sufficient to quote certain language used in a case that more nearly resembles this than any cited (Traver v. Brown, 14 App. D. C. 34, 41):
“The facts in regard to the test of the old machine, and the surrounding circumstances from which inferences are to be deduced, make out a case, in our opinion, very different from either that of Coffee v. Guerrant, 3 App. D. C. 497, 499, 501, or that of Wurts v. Harrington, 10 App. D. C. 149, 155, both of which have been cited on behalf of appellant. We think, on the other hand, that they bring the case more nearly within the scope of the following decisions in which it was held that what was done by the claimant fell short of reduction to practice, or amounted to nothing more than an abandoned experiment. Glidden v. Noble, 5 App. D. C. 480, 493, and Guilbert v. Killinger, 13 App. D. C. 107.” See, also, Appert v. Schmertz, 13 App. D. C. 117, 131.
*345 For the reasons given the decision of the Commissioner awarding priority to Kelley must be reversed. It is so ordered, and that the proceedings herein be certified to the Commissioner of Patents as prescribed by law. Reversed.